## FITZSIMMONS v. PRUDENTIAL INS. CO. OF AMERICA.

### No. 7076.

Circuit Court of Appeals, Seventh Circuit.

April 30, 1940.

Rehearing Denied June 12, 1940.

TREANOR, Circuit Judge, dissenting.

Nathaniel Rubinkam, Ira W. Hurley, and Albert E. Hallett, Jr., all of Chicago, Ill., for appellant.

Edwin D. Lawlor, of Chicago, Ill., for appellee.

Before EVANS, SPARKS, and TREANOR, Circuit Judges.

SPARKS, Circuit Judge.

On March 4, 1930, appellant issued its policy for $10,000 upon the life of John T. Fitzsimmons. The first annual premium was paid, and the insured died on July 21, 1933. Appellee, his wife, was the beneficiary under the policy and brought this action to recover the full amount thereunder. The cause was tried to a jury. Appellant moved for a directed verdict at the close of appellee's evidence, and again at the close of all the evidence, and both motions were overruled. A verdict for appellee was returned in the sum of $8,000, and judgment was entered thereon. The appeal is from that judgment.

The question presented is whether, under the evidence, appellee or the insured, was entitled to rely upon the provision of the policy with respect to waiver by appellant of the payment of premiums in case of total and permanent disability of the insured.[1]

The specific questions presented are whether the insured became totally and permanently disabled before the policy lapsed for non-payment of premiums, and whether or not due proof of total and permanent disability was made to the Company for the purpose of securing a waiver of premiums before the policy lapsed.

The evidence discloses that for more than twenty years prior to his death the insured had been president of and sole salesman for the Plumbing Sales Company, which had its place of business in Chicago. He also did its purchasing and was very active in the business. Until May of 1931, he lived many miles from his place of business.

On February 21, 1930, he applied to appellant for two policies of $10,000 each on his own life, upon one of which this action is brought. The other upon his death was paid in full and is not involved here. In his application for these policies, he stated that he had never had syphilis. Both policies

---

[1] "If the Insured shall become totally and permanently disabled, either physically or mentally, from any cause whatsoever,' to such an extent that he is rendered wholly, continuously and permanently unable to engage in any occupation or perform any work for any kind of compensation of financial value during the remainder of his lifetime, and if such disability shall occur at any time after the payment of the first premium on this Policy, while this Policy is in full force and effect and the Insured is less than sixty years of age, and before any nonforfeiture provision shall become operative, the Company, upon receipt of due proof of such disability, will waive the payment of any premium or premiums under this Policy, the due date of which, as specified on the first page of the Policy, shall occur after receipt by the Company of said proof of such disability."

were issued on March 4, 1930, and on June 5, 1930, the first year's premiums were paid. Both policies were incontestable after one year.

On May 6, 1930, the insured consulted his physician who found after certain tests that he was suffering from syphilis, and at the trial the doctor gave it as his opinion that decedent had contracted the disease ten years previous to the examination. At the time of the examination decedent denied all history of venereal diseases.

When the second annual premiums on both policies were about to come due, notices were sent to the insured of that fact, but he showed a definite lack of interest. Therefore, his wife, the beneficiary, went to the appellant's office, exhibited the premium notices on both policies to its cashier and told him her husband was ill; that because of their financial condition she had come to the conclusion that they would have to drop one of the policies, but wanted to make new arrangements about meeting the premium on the other policy. The cashier tried to get her to continue both policies, but she insisted that they were financially unable to do so. He then prepared the necessary forms to enable her to pay the premiums on both of the policies on a quarterly basis, and told her to take them home and have the insured sign them. She told the appellant's cashier that her husband was nervous and mentally ill, that he was not tending to his business, and that he was in no condition to do so. She told her husband nothing about his trouble or his ailment, and said that she did not then know that he had syphilis. At that time she did not ask for a waiver of premiums.

The record does not disclose that appellee advised appellant's agents that the insured was totally and permanently disabled. She had never seen either of the policies during her husband's lifetime and did not know about the provisions therein relating to waiver of premiums on the ground of total and permanent disability until two years after the insured's death. Appellee took the forms, which the cashier had given her, to her home and had her husband sign them on April 4, 1931, and she returned them to the appellant's office on April 6, 1931. At that time she told the cashier that she was of the opinion that they could carry only one policy, that she had sufficient funds to pay only on one policy and would have to drop the other. On May 6, 1931, she met the quarterly payment on the policy which she kept in force, and she made no payment upon the policy sued upon. No payment other than the first year's premium was ever made on the policy in suit, and it was lapsed by the Company as of April 5, 1931, at the end of the grace period.

At the time the policies were issued the insured was alert, prosperous, and quite popular in his business. He was an exceptionally successful salesman, well posted in the prices of the products in which he dealt, and greatly esteemed by his friends, associates and customers.

Toward the end of the year 1930, the insured appeared less alert on quoting prices in his business, sometimes having to check up on the current price. At times he would walk away from customers with whom he had been conversing without completing his conversation. He seemed to tire more quickly, and came home earlier in the afternoons, and he often telephoned his customers instead of calling on them in person, as he had formerly done. He lost interest in his business and seemed listless. He continued to drive his car as usual but seemed to be not as proficient in that respect as formerly, and had some minor accidents.

Around Christmas of 1930, he took less than his usual interest in the season's festivities. His dress was not as immaculate as previously. He mumbled to himself, showed lack of attention to the conversation of his friends; he laughed excessively at trivial matters, or for no apparent reason; and he exhibited a lack of his former interest and ability in the game of poker, of which he had always been very fond.

Once, in the early part of 1931, he was unable, without assistance, to find his car which he had parked. About this time he began to blink and squint his eyes, and his wife, without success, tried to have him wear glasses.

On April 30, 1931, decedent's lease for his residence expired, and he took little interest in whether it was to be renewed or not, and his wife made arrangements to move to a new location. During their removal on April 30, he misplaced one of his wife's rings in the confusion. After they had moved he seemed to pay less attention to his business, and on this account she began to go to his office in April or May of 1931. During May and June of that year, the insured continued to go to his office and attend to his business in a rather listless manner, and he continued to receive an income from it He did not stay in the house,

but continued to drive his own car although his wife frequently went with him. His driving was not very good, he had several accidents and eventually stopped driving the car. During the month of May of that year he called on a customer, who observed that his mouth twitched.

On May 19, 1931, the insured made written application to the Illinois Traveling Men's Health Association for health and accident insurance, in which application the insured warranted that he had had no sickness or disease in the past five years, that the general condition of his health was good, that he had never had and did not then have syphilis, mental infirmities, venereal disease, or any other sickness· or disabling condition. That policy was issued to him on May 23, 1931.

During the summer of that year he stopped going to ball games, which was his former custom, and he was not so alert at cards. In July or August of 1931, he went to his office at ten o'clock in the morning, came home about three in the afternoon and took long walks. On' one occasion when he was taking a street car to work in September, 1931, he appeared shabby in his dress and his mouth twitched. He sold and delivered plumbing supplies in the fall of 1931 and stayed at a customer's house for dinner until eleven or twelve o'clock at night. The customer's home was at 7800 South, and insured was living on the north side of the city. As late as November and December of 1931, he was still going to his office, but not every day. At times during the year of 1931, the insured seemed to regain his former self, his friends commented on his excellent appearance, at which times he would be very well, but frequently he would become morose again. The only times ·when he would admit illness were when he had headaches. In January or February, 1932, he was in the hospital for a time. While there he refused to eat his meals lying down, saying he was not sick enough for that. Several weeks before his death in July of 1933, he was confined to his bed, and died on July 21 of that year. This action was begun on July 8, 1936.

There were sixteen witnesses who testified for the appellee. Included in this number were the appellee, the family physician, and another physician who testified as an expert. All of these witnesses, except the medical expert, had known the insured for considerable time and had sustained rather close relationships with him during the year 1930 and from that time until his death. After detailing their relationships, their observations of him, and their conversations with him, seven of them gave it as their opinion that he was incompetent since December, 1930; eight of them, including the family physician and the appellee, stated that he was mentally incompetent during all of that period; and the medical expert in response to the hypothetical question gave it as his opinion that he was mentally incompetent during that period.

■ Accepting all of this evidence at its face value, we think it comes far short of showing that the insured was totally and permanently disabled when his policy was lapsed for non-payment of dues on April 5, 1931. The testimony of Mrs. Fitzsimmons is undenied, and she testified that the insured did continue his work, in some degree at least, after the policy had lapsed and during the summer months of 1931. With respect to his condition as late as November of that year she said:

"I would' not say he went to work practically every working day of November, 1931. It was intermittent. He would be well one day and the next day he wasn't well and he wouldn't go."

It is further undenied that he took orders over the phone during this same period. True, he did not do the work he had formerly done and he was not the alert business man that he had theretofore been, and there is no doubt that there was no chance for his recovery. Of this fact, however, no one had knowledge except the family physician, and he had told no one at that time. He testified:

"There are times where the patient with general paresis will be capable of doing things that they are used to doing under guidance, a guiding person can take that individual and have him do things and he will transact those businesses just as well as he did before, but he is liable to turn around and do the opposite thing the next minute."

■ Under the terms of this policy the insured was not entitled to a waiver of the payment of premiums unless he was totally and permanently disabled on the due date of that premium. In order to entitle him to that privilege it would not be sufficient to merely show that he was affected with a fatal disease. Total and permanent disability at 'that time must have been shown. Those words mean precisely what they say, and there is no evidence in this record to

show that the insured was totally disabled at the time this policy was lapsed. It was error for the court to refuse to direct a verdict for appellant, and the judgment will have to be reversed.

In view of this conclusion, it is unnecessary for us to pass upon the question whether or not due proof of total and permanent disability was made to the company for the purpose of securing a waiver of premiums before the policy lapsed. We also refrain from passing on the question of the validity of the verdict and judgment for $8,000, when it is obvious that appellee was entitled to recover at least $10,000, or nothing.

The judgment is reversed and the cause is remanded for further proceedings not inconsistent with this opinion.

TREANOR, Circuit Judge (dissenting).

I cannot agree that there is a lack of substantial evidence to support a finding that the insured was totally and permanently disabled at the time that the policy in question lapsed. One of the medical witnesses who had been in charge of the treatment of the insured testified that the insured was suffering from paresis in the latter part of February or first part of March, 1931, at which time the policy sued on was still in full force and effect; the witness testified further that paresis was disabling and that the insured had become mentally incapable of transacting business and remained so until he died. Another specialist testified, in answer to a hypothetical question, that in his opinion the "hypothetical man" was mentally incompetent from January 31, 1931, to the date of his death. There was a mass of lay testimony respecting the insured's appearance, actions and physical condition tending to show that the insured had become mentally incompetent prior to the lapse of the policy. It is true that there was testimony to the effect that the insured continued to appear at his place of business beyond the date of the lapse of the policy; and that he performed at least the physical actions of transacting business. I think, however, that such evidence is of relatively little significance in view of the nature of defendant's malady. As in the case of all persons suffering from paresis the deceased was the victim of hallucinations, which in his case, as disclosed by testimony, took the form of an obsession that he was "doing all the plumbing business in Chicago." This very hallucination, which stamped him as mentally incompetent, necessarily resulted in an appearance of continued interest in his business, and in a continuance of habitual physical activities related thereto. One of the specialists testified that paretics react automatically; consequently, it was a normal manifestation of the insured's mental incompetency for him to continue activities to which he had been habituated for years, even though his mental condition was such that he was unable to understand the nature or significance of transactions of vital importance to the continuance of his business. The conduct, appearance, and mental and physical condition of the insured during the period extending from a few months prior to the lapse of the policy to the date of his death are indicated by the following descriptive language of witnesses: A slow muscular tremor of the lips and jaw; thickness of tongue; slow speech and muttering; enlargement of the pupil of one eye; apparent loss of walking ability; a kind of wandering; a non-alertness; untidiness; incoherence; restlessness; inattention to business; inability to concentrate; twitching of the mouth; unreasonable laughter; rambling and repetitious talk; staring into space; possessing a staring look on the face; drawn appearance; dragging of feet; mouth open; delusions of wealth; squinting; blinking; forgetfulness; disconnected, desultory and unstable conversations. It is difficult to believe, as a practical matter, that an employee of a plumbing business would have been considered competent to retain a responsible position if his mental and physical condition was such as the foregoing language reasonably indicated that the insured's condition was during the time that he was indulging in the appearance of transacting his business. The insured was the president and actual owner of his "Plumbing and Sales Company," was its only salesman, and handled the purchasing. It was a one-man business conducted and controlled by the insured. If he had been employed as a manager of a similar business it is impossible to believe that he would have been allowed to continue in his position up to the time of the lapse of the policy.

In my opinion there was substantial evidence to support the verdict.

Also, in view of the circumstances, I believe that defendant company received "due proof" of the insured's disability.